IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| NEW GAMING SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO.  CIV-08-0698-HE |
| | ) | |
| NATIONAL INDIAN GAMING | ) | |
| COMMISSION, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff New Gaming Systems, Inc. ("NGS") filed this action against the National Indian Gaming Commission ("NIGC"), its chairman and vice chairman, the Sac and Fox Nation ("Nation") and the Sac & Fox Business Enterprise (" Enterprise"), seeking judicial review of a final decision of the NIGC under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  The dispute arises out of an equipment lease and promissory note NGS, the Nation and the Enterprise executed in conjunction with the construction and operation of a casino. The controversy over the validity of the lease and note has resulted in proceedings in three different forums.   After considering the Administrative Record and the parties' briefs, the court concludes the agency's decision should be affirmed.

## Background[1]

The Indian Gaming Regulatory Act ("IGRA" or "Act"), 25 U.S.C. §§ 2701-2721,

---

[1]*The background is taken principally from the Administrative Record ("Admin.R. at ___").*

establishes a comprehensive regulatory framework for gaming activities on Indian lands  to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments," while simultaneously "shield[ing tribes] from organized crime and other corrupting influences [and] ensur[ing] that ... Indian tribe[s are] the primary beneficiar[ies] of ... gaming operations."  25 U.S.C. § 2702; First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc., 412 F.3d 1166, 1167 (10th Cir. 2005).  The Act "effects these goals in part by providing for federal oversight of contracts between tribes and non-tribal entities for the management of tribal gaming operations."  *Id.* at 1167-68; Casino Res. Corp. v. Harrah's Entertainment, Inc., 243 F.3d 435, 438 n.3 (8th Cir. 2001) ("IGRA recognizes a tribe's authority to enter into contracts for the management and operation of an Indian gaming facility by an entity other than the tribe or its employees, so long as certain requirements are satisfied and subject to approval by the Chairman of the National Indian Gaming Commission.").  Approval of the NIGC Chairman is required if a tribe enters into a management contract for a gaming operation. 25 U.S.C. § 2711(a)(1);  First American, 412 F.3d at 1168.  An unapproved management contract is void, 25 C.F.R. § 533.7, and a gaming operation that violates any provision of the IGRA may be closed and fined.  25 U.S.C. §2713.

The Nation decided in 2003 to build a new casino in Oklahoma and selected NGS to provide financing and equipment for the project.  Admin. R. at 2.  The dispute in this action arises out of a gaming machine equipment lease and promissory note[2] NGS, the Nation and

---

[2]*The Nation signed a second promissory note on April 28, 2004, which was identical to the first, excepting the amount and date.  Admin.R. at 2.*

Enterprise executed on August 8, 2003, in conjunction with the construction and operation of the casino, which is owned and operated by the Enterprise for the Nation. On August 14, 2003, the Nation sent the lease and note to the NIGC for review,[3] seeking an opinion on whether the two documents constituted a management agreement within the meaning of the IGRA, 25 U.S.C. § 2711, which required the NIGC Chairman's approval.[4] Admin.R. at 2-3, 961,992-93. The Nation resubmitted the lease and note for review on or about May 6, 2004. Admin.R. 180.

The Sac & Fox Casino opened approximately August 1, 2004, with NGS supplying the gaming machines. On August 11, 2004, NIGC's acting general counsel, Penny J. Coleman, responded to the Nation's request of a year earlier for an opinion regarding the lease and note the parties had executed. She concluded the agreements constituted a management contract that, under IGRA, required the approval of the Chairman of the NIGC. She asked the Nation to submit the information and documents that, pursuant to 25 C.F.R. §533.3, must accompany a request for approval of a management contract within twenty

---

[3]*The documents were sent to Marcelin Pate, a Field Investigator with the NIGC. She forwarded them to Penny Coleman, Deputy General Counsel. Admin.R. 992-93.*

[4]*The lease and note were submitted to the NIGC for a determination of whether "the agreement require[d] the approval of the NIGC," not for its approval as a management contract. See www.nigc.gov/Reading_Room/Bulletins/Bulletin_No._1993-3.aspx. ("In order to provide timely and uniform advice to tribes and their contractors, the NIGC and the BIA have determined that certain gaming-related agreements, such as consulting agreements or leases or sales of gaming equipment, should be submitted to the NIGC for review. In addition, if a tribe or contractor is uncertain whether a gaming-related agreement requires the approval of either the NIGC or the BIA, they should submit those agreements to the NIGC."). If the agency determined approval was required, it would notify the tribe to formally submit the agreement. Id., see 25 C.F.R. § 533.3.*

days.  She advised the Nation that "an unapproved gaming management contract is void and

no action should be taken under it," and also noted that the NIGC had "serious concerns"

regarding the classification of the gaming devices leased by NGS.  Admin.R. at 964.  She

"reminded" the Nation "that operation of Class III gaming without benefit of a Tribal-State

compact is a violation of the IGRA and grounds for closure of the operation."  *Id*.  Upon

receipt of the letter, the Nation – by this time under different tribal leadership than was in

place in 2003 – terminated the agreements with NGS and demanded that it remove its gaming

machines from the casino.[5]  Neither party provided the requested documents to the NIGC or,

at that time, requested a formal ruling from the NIGC.

In 2005, NGS sued the Nation and Business Enterprise in the Sac and Fox tribal court

for breach of the lease and note.[6]  A key issue in that litigation was the validity of the

agreements.  Two years later, while that action was pending, the Nation requested a final

agency determination as to whether the lease and note comprised a management agreement

under IGRA.  Admin.R. at 666.  The Nation asked  the NIGC to"[p]lease note" that it was

"*not* requesting that [the NIGC] approve such Contracts as a management contract . . . ."

Admin.R. at 285.  The NIGC told the Nation to "submit the Agreements, together with all

---

[5]*The Administrative Record reflects that the Enterprise board contacted the Nation, stating that it was "imperative" that it commence negotiations with the NIGC and obtain written permission that "would allow the Casino to remain open while the deficiencies of the Equipment Lease Agreement and Promissory Note are resolved."  Admin.R. at 185.  By letter dated August 20, 2004, NGS also sent the Nation proposed amendments to the lease addressing issues raised by the Coleman opinion.  Id. at 186-88.*

[6]*While that action was pending the Nation paid the promissory notes in full and NGS amended its complaint to sue for breach of the equipment lease.*

4

submission requirements set forth in 25 C.F.R. § 533.3" and "invite[d] NGS to submit any information it wish[ed]." Admin.R. at 416. The Nation submitted the lease and note, but did not submit the documents required by 25 C.F.R. § 533.3. *Id.* at 84. NGS submitted an expert report and the deposition testimony of its president, two members of the Board of Directors for the Business Enterprise and Chief Rhoads, and requested a hearing on the issue of whether the lease constituted a management contract.

The Chairman of the NIGC issued an opinion dated March 26, 2008. He denied NGS's request for a hearing, concluding there is no right to a hearing prior to a decision by the Commission approving or disapproving a management contract. *See* 25 C.F.R. § 539. The Chairman concurred with, and adopted, the Office of General Counsel's opinion that the lease and note were a management contract. He then disapproved the contract, finding the lease and note did not "satisfy the standards of 25 C.F.R. Part 531 and § 533.3." Admin.R. at 85.

NGS appealed the Chairman's decision and, on May 22, 2008, the agency issued its final decision and order, concluding that the Chairman had properly determined that the equipment lease and promissory note constituted a management contract[7] and had properly disapproved the contract because the agreements did not "include all of the provisions

---

[7]*The court does not agree with plaintiff that the NIGC Decision is "based directly upon the Coleman Letter." Plaintiff's reply, p 3. The Chairman did "concur with, and adopt, the OGC opinion that the Agreements are a management contract." Admin.R. at 84. However, the Commission, while agreeing with the decision reached by the Chairman, and finding that he "properly determined that the equipment lease and promissory note constitute a management contract for the reasons stated in his March 26, 2008 disapproval letter," id. at 2, conducted its own analysis of the issue. See Admin.R. at 9-12.*

required of management contracts by 25 U.S.C. § 2711(b) or 25 C.F.R. § 531.1." Admin.R. at 2.[8] NGS then filed this action on July 10, 2008, seeking review of the NIGC's final decision under the APA.[9] The Tribe and Enterprise immediately moved to stay these proceedings pending a final resolution of the tribal court action.

On October 16, 2008, the tribal district court dismissed NGS's lawsuit, finding that the equipment lease and promissory note, when considered together, met the definition of a management contract under IGRA requiring the approval of the NIGC Chairman. As the Chairman had not approved the lease and note, the tribal court concluded they were void. Because the agreements were void, the tribal court held that the Tribe's limited waiver of sovereign immunity contained in the agreements was ineffective, requiring dismissal of the case for lack of jurisdiction. The Sac & Fox Supreme Court affirmed the dismissal on appeal on June 16, 2011.

The Nation then moved to dismiss this action on the basis of sovereign immunity and

_____

[8]*The Commission also concluded the Chairman had properly disapproved the management contract. As the present appeal goes only to the question of whether the arrangement constituted a management contract – not whether any management contract should be approved – the court has no reason to pass on the approval question. It does note, however, its considerable skepticism that the agency could properly disapprove a management contract on the basis of a desire to avoid "impos[ing] upon the Nation any agreement that it no longer wanted." Admin.R. at 2. Protecting the interests referenced in the IGRA is one thing. Turning a contract into a deal binding only on one party is something decidedly different.*

[9]*After determining that the lease and note constituted a management agreement, the NIGC Chairman disapproved the agreement. On appeal, the NIGC affirmed both decisions. Plaintiff has appealed the determination that the lease and note fall within IGRA. It has not challenged the NIGC's decision that the Chairman properly disapproved the parties' agreement under both 25 U.S.C. § 2711(b) and (e)(4).*

6

issue preclusion.  The court denied the motion following a hearing on December 2, 2011.

It concluded it had jurisdiction under the APA to hear NGS's appeal from the final agency

decision and, after that ruling, would consider issues relating to the preclusive effect of the

tribal court's decision, if necessary.

The court also deferred ruling on plaintiff's objection to the administrative record filed

by the NIGC.  NGS argued the record was incomplete and that the agency had improperly

withheld materials designated as privileged.  It claimed the withheld materials might

demonstrate that the NIGC "improperly took action in order to support the new Principal

Chief, Kay Rhoads, from avoiding valid obligations of the Nation and Enterprise to New

Gaming."  Plaintiff's Objection, Doc.# 63, p. 2.  Plaintiff asserted that the NIGC "did not

act in a fair and impartial manner in applying the law to determine whether the Equipment

Lease and Promissory Note constituted a management contract," and that certain documents

plaintiff had not seen "may directly relate to the NIGC's motivation in reviewing the

Equipment Lease and Promissory Note."  *Id*. at p.4.

As both parties appeared to agree that the appeal issue – whether the lease and note

constituted a management contract – is an objective determination that can be made as a

matter of law,[10] the court concluded that its resolution of that threshold question might

---

[10]*In its objection to the record, NGC argued that "[t]he determination of whether the Equipment Lease and Promissory Notes together constitute a management contract is a legal question that does not involve an exercise of discretion or a determination of what is in the best interests of the Nation."  Plaintiff's Objection, Doc.# 63, p. 6.  In its July 23, 2007, letter to the NIGC requesting final agency action, the Nation stated: "We believe that determinations about whether the agreements are management agreements or not can be made by simply looking at the 'four corners' of the agreements with no need to delve into extensive factual issues such as*

eliminate the need to determine whether the withheld documents, which might bear on the agency's subjective motivation, should be produced.  *See* plaintiff's reply, p. 2.  It decided to defer its ruling on plaintiff's objection to the record until it had considered the parties' briefs on the merits.

Standard of Review

Under the APA the court decides relevant questions of law and interprets statutory provisions.  5 U.S.C. § 706.  The court "review[s] matters of law de novo and will defer to the agency's construction of the [statute] if Congress has not clearly spoken on the issue before [the court] and has delegated authority over the subject at issue to the agency, unless the agency's 'construction is unreasonable or impermissible.'"  Forest Guardians v. U.S. Fish & Wildlife Serv., 611 F.3d 692, 704 (10th Cir. 2010) (quoting Wyo. Farm Bureau Fed'n v. Babbitt, 199 F.3d 1224, 1231 (10th Cir.2000)).

The court understood the parties to essentially agree that, in the circumstances of this case, the question of whether the note and lease constituted a management agreement was a legal issue subject to *de novo* review.[11]  As the NIGC makes clear in its surreply, its position now is that the court should review its final decision under the arbitrary and capricious standard.  That is the usual standard of review under the APA and one that would have been applied here, had the parties not agreed, or seemed to agree, that the court could

---

*performance, termination or alleged bad faith as NGS seeks to do in the tribal litigation."* Admin.R. at 430.

[11]*See supra note 10.*

make "a four corners determination based upon what's in the terms of the contract." Doc. #87, Exhibit 1, p. 24.

The court has conducted a de novo review of the lease and note. As it concludes the agency determination was proper even under this more exacting standard, it is unnecessary to consider the potential application of the arbitrary and capricious standard.

Analysis

Plaintiff claims that IGRA's implementing regulations are both void-for-vagueness and arbitrarily enforced, and that the NIGC failed to follow proper procedures.[12] It also contends the NIGC erred in determining that the equipment lease and promissory note (collectively the "Agreement") constituted a management contract under IGRA.

Validity of 25 C.F.R. § 502.15

A regulation is void for vagueness if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000). While neither the statute nor the regulations define "management," the regulations define a management contract as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15. Plaintiff claims the definition relies upon two

---

[12]*Although the plaintiff refers to invalid regulations, plural, it discusses only § 502.15 in its brief.*

critical undefined terms: "management" and "all or part of a gaming operation," which are so vague they are void and lack valid enforcement standards.  Plaintiff's brief, p. 26.

Plaintiff argues that because the term "management" is not defined, a person of common intelligence must guess "as to whether having the right to participate in the selection of the auditor " or  "supply[ing] [a casino with] 20%, 40%, 60%, 80% or 100% of the games constitutes management" under IGRA."   Plaintiff's brief, pp. 27,28.  It asserts a similar problems exists with the term "part of a gaming operation."  Due to the lack of guidance in the regulation, plaintiff claims it is unclear whether "a person who repairs a broken machine [is] engaged in 'management' of 'part of a gaming operation.'" Plaintiff's brief, 28.

 Because the term "management" can cover a broad range of activities, the regulation cannot,  as plaintiff appears to suggest, enumerate them all.  However, that does not mean that the term is vague.  The Seventh Circuit has concluded that "[t]here is no solid indication, in either the language or the structure of the statute, that Congress intended to limit its regulation of third-party contractual participation in Indian enterprises to a particular kind of activity."  Wells Fargo Bank, Nat'l Ass'n v. Lake of the Torches Econ.Dev.Corp., 658 F.3d 684, 695 (7th Cir. 2011).  Citing 25 C.F.R. § 502.12, the court found the NIGC had taken the "same broad approach to regulation." *Id.*

Here, as in Hill, plaintiff is "proffer[ing] hypertechnical theories as to what the statute covers."  Hill, 530 U.S. at 733. The Commission did not conclude the lease was a management contract on the basis of a single provision.  It did not find the authority to help choose an auditor, by itself, turned the lease into a management agreement.  It did not

10

mention the repair provision in the lease in its Final Decision and also did not focus on the percentage of machines that NGS was going to supply to the casino. Its concern was NGS's right to determine the type or mix of the gaming machines on the casino floor.[13]

"[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Id.* (internal quotations omitted). As "[t]he likelihood that anyone would not understand ...[the] common word[s] [management and "part of a gaming operation"] seems quite remote, *id.* at 732, the court rejects plaintiff's attack on 25 C.F.R. § 502.15. The terms in the challenged regulation, 25 C.F.R. § 502.15, are sufficiently explicit to give notice and prevent arbitrary enforcement. *See generally* Scherer v. U.S. Forest Serv., 653 F.3d 1241, 1243 (10th Cir. 2011) ("To prevail in this and any facial challenge to an agency's regulation, the plaintiffs must show that there is 'no set of circumstances' in which the challenged regulation might be applied consistent with the agency's statutory authority."). NGS also has not shown sufficiently similarity between its lease and other agreements, to demonstrate that the Commission has arbitrarily and capriciously "enforce[d] the management contract regulation against [it]," and not enforced the regulation "against vendors with similar contract provisions." Plaintiff's brief, p. 29.

---

[13]*The lease provided that:*
*The machines will be a mix of approximately eighty percent (80%) of machines, which are NGS design and approximately twenty percent (20%) of machines from other manufacturers which are agreed upon by the parties so that Enterprise will have a proper mix of gaming equipment at its casino. The exact mix of the machines that NGS will make available will be agreed upon by the parties.*
*Admin. R. at 299, ¶ 1.1.*

11

Plaintiff also contends that the NIGC violated the language of the IGRA when it issued § 502.15.  It claims "[t]he legislative history of the IGRA makes it clear that only contracts 'governing the <u>overall</u> management and operation' of a gaming facility are covered."  Plaintiff's brief, p. 11 (emphasis added).  Citing a Senate Report, S.Rep.No. 100-466, U.S.Code Cong. & Admin. News 1988 at 3071, plaintiff asserts that the term "management contract" was not meant to apply to "contracts 'for the procurement of particular services, materials or supplies.'"[14]  Plaintiff's brief, p. 12.  However, plaintiff has not shown that the agency's construction of the statute – that it applies to an agreement providing for the management of  "all <u>or part of</u> a gaming operation," 25 U.S.C. § 502.15 (emphasis added), is contrary to clear congressional intent.  *See generally* <u>Chevron , U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843 n. 9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").  The IGRA expressly delegates to the Commission the task of "promulgat[ing] such regulations and guidelines as it deems appropriate to implement the provisions of [IGRA]." 25 U.S.C. § 2706(b)(10).  "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  <u>Chevron</u>, 467 U.S. at 843-44.

---

[14]*The lease the parties executed was more that just a procurement contract.*

The Seventh Circuit has recognized that, while "[a]n examination of the statutory provisions simply yields no definitive answer with respect to the breadth of the term 'management contract,' ... [i]t does, however, make clear that Congress wrote in broad strokes in crafting this legislation. <u>Wells Fargo Bank</u>, 658 F.3d at 695.  The court noted that, in enacting IGRA, Congress intended "to provide a comprehensive regulatory framework for gaming operations by Indian tribes that would promote tribal economic self-sufficiency and strong tribal governments while shielding them from organized crime and other corrupting influences."  *Id.* at 694.  In light of the legislative delegation and Congress's stated goals in enacting IGRA, *see* 25 U.S.C. § 2702, the court concludes the regulation is based on a permissible construction of the statute.

<u>Right to a Hearing</u>

Plaintiff contends the NIGC failed to afford it a hearing prior to issuing its Final Decision.  It claims it requested a hearing pursuant to 25 U.S.C. § 2711(f), "to present evidence concerning the technical terms and terms of art specific to the gaming industry contained in the Equipment Lease ... [and] evidence on what activities constitute management of a gaming operation."  Plaintiff's brief, pp. 23-24.

The statute plaintiff relies on is inapplicable.  It provides that "[t]he Chairman, after notice and hearing, shall have the authority to require appropriate contract modifications or may void any contract if he subsequently determines that any of the provisions of this section have been violated."  25 U.S.C. § 2711(f).  As explained by the Commission, § 2711(f), by its terms, "applies only in those situations where the Chairman reaches out and voids or

modifies a contract he already approved.  IGRA requires a notice and hearing before he does so."  Admin.R. at 13.  As plaintiff was not entitled to a hearing, the Commission did not commit procedural error by failing to conduct one. [15]

Management Contract

Determining whether the Agreement is a management contract for the operation of a gaming facility within the meaning of IGRA is a matter of statutory interpretation.  IGRA allows an Indian tribe to "enter into a management contract for the operation and management of a class II gaming activity," if the contract has been approved by the Chairman of the Commission.  25 U.S.C. § 2711(a)(1).[16]  The Act does not define "management contract," but the term is defined in the regulations as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor ... [that] provides for the management of all or part of a [tribal] gaming operation.'" First American, 412 F.3d at 1172 (quoting 25 C.F.R. § 502.15).[17]  The regulations also define a primary management official as "[a]ny person who has authority ... [t]o set up working policy for the gaming operation." 25 C.F.R. § 502.19.

---

[15]*The Chairman also noted that because the contract language was unambiguous, resort to extrinsic evidence was unnecessary.  Admin.R. at 12-13.*

[16]*Approval of management contracts by the Chairman is also required in connection with Class III, rather than II, gaming operations.  25 U.S.C. § 2710(d)(9).  There appears to have been at least a question as to the types of games provided by NGS.  Coleman letter of August 11, 2004, p. 4; Admin.R. at 964.*

[17]*"In contrast, contracts for supplies, services, or concessions involving amounts in excess of $25,000 annually are merely subject to audits by the Commission." Casino Res., 243 F.3d at 438 n.3, citing  25 U.S.C. § 2710(b)(2)(D).*

Key to this case is the phrase "all or part of a gaming operation" in the regulation's definition of a management contract. 25 C.F.R. § 502.15 (emphasis added). While the lease relates principally to just one aspect of the casino's operation, its gaming machines, that is sufficient under both the regulations and case law for the Agreement to be governed by the IGRA. *See* Wells Fargo Bank, 658 F.3d at 694-99; First American, 412 F.3d at 1175.

Under the terms of the lease, NGS had control over the type of gaming equipment that would be available at the casino. It was to provide 80% of the gaming machines, with the remaining 20% to be provided by "other manufacturers which [were] agreed upon by the parties." Admin.R. at 299. "The exact mix of the machines that NGS [was to] make available [was to] be agreed upon by the parties." *Id*.[18]  *See* First American, 412 F.3d at 1175 (court rejected argument that "a contract is only a management contract if it confers rights rather than opportunities to manage," noting that "neither the statute nor the regulations contain a definition of manager or management that would suggest that management is only management when the manager's decisions are not subject to tribal oversight"). As the Commission concluded, "[c]hoosing the mix of machines on the casino floor is an essential

---

[18]*Plaintiff asserts in its reply that "[p]aragraph 1.1 does not specify who will select the leased machines," that "[p]aragraph 1.1 does not state that NGS will select the machines, and NGS did not in fact select the machines, only supply them." Plaintiff's reply, p. 5. Plaintiff ignores the lease language, which provides that the "exact mix of the machines that NGS will make available will be agreed upon by the parties." Admin.R. at 299. Plaintiff asserts that the NIGC "has never stated how the powers purportedly granted to NGS under paragraph 1.1 differ from a standard lease. Plaintiff's reply, p. 5. In a standard lease, the lessor/vendor would provide the machines or equipment the lessee selected, rather than the machines which it determined the lessee should use or which it played a significant role in selecting. That control is what distinguishes this lease from a "standard lease."*

management function."  Admin. R. at 10.  The right to participate in game selection altered

NGS's role from that of equipment supplier to manager of at least one aspect of the Nation's

gaming operation.

The lease, which was a percentage lease, also obligated NGS to provide "a complete

computerized cash accounting system"[19] and train casino employees on its operation.  The

Enterprise was barred from using a different system without NGS's prior consent.  Admin.R.

at 302, ¶ 6.  Plaintiff discounts the significance of NGS' control over the system used,

describing it as "nothing more than an integrated software program to track all bets and

payouts." Plaintiff's brief, p. 20.   The Commission viewed NGS's contractual right

differently.  "Like the choice of machine mix, the choice of slot accounting system is an

essential management function because such systems enable player reward programs and,

in some instances, ticket redemption."  Admin.R. at 11.  Whether or not the accounting

system is of "fundamental importance to the casino's management," defendants' brief, p. 14,

the court concludes that, by choosing the system, NGS was exercising a management

function.

Other lease provisions required Enterprise to prepare and supply NGS with daily,

weekly, monthly and annual reports generated by an electronic data tracking system that was

"developed in cooperation and with the agreement of NGS."  Admin.R. at 307, ¶ 16.1.

Enterprise was to maintain books and records pertaining to all use of the gaming equipment

---

[19]*The Commission refers to this as the "slot accounting system."  Admin. R. at 11.*

NGS provided and they were to be accessible to NGS "at all times during the [lease] Term and for a period of three (3) years thereafter." *Id.* at ¶16.3. The parties also were to share responsibility for the selection of the accounting firm which would perform the annual audit required by IGRA. See 25 U.S.C. § 2710(b)(2)(C).[20]

NGS was not authorized or obligated by the equipment lease to be involved in the "overall" management of the casino. However, that is not required for IGRA to apply. Pursuant to its agreement with the Nation, NGS given the right to manage, or the opportunity to manage, significant parts of the gaming operation. Its role was more than that of a mere supplier. *See* First American, 412 F.3d at 1172-75; NIGC Bulletin 94-5 ("A requirement for including within the scope of audit of the gaming operation other contracts, including supply contracts, is similarly a means of protecting the gaming operations and ultimately the tribes from those deemed unsuitable for Indian gaming or on terms at variance with IGRA's requirements.").[21]

NIGC Bulletin 94-5, which discusses the distinction between management contracts and consulting agreements, supports this conclusion. While the Bulletin, as an informal

---

[20]*NGS asserts that reliance on ¶ 16.4 of the lease as a basis for concluding the contract is a management agree is "misplaced" in part because "the scope of the independent audit subject to that requirement is limited to matters 'applicable to the use of the Equipment.'" Plaintiff's reply, p. 6 (quoting Admin.R. at 308). However IGRA specifically requires that an Indian tribe engaged in Class II gaming provide "annual outside audits of the gaming," 25 U.S.C. §2710(b)(3)(C), which includes proceeds from the equipment provided pursuant to the terms of the lease.*

[21]*NIGC Bulletin 94-5 is available at www. nigc. gov/ Reading_ Room/ Bulletins/ Bulletin_ No._ 1994– 5. aspx.*

agency pronouncement, is not entitled to deference under <u>Chevron</u>, the Tenth Circuit observed in <u>First American</u> "that the NIGC's apparent position coincides with [the court's] holding." *Id.* at 1174. The court noted that the Bulletin "defines management broadly to include 'planning, organizing, directing, coordinating, and controlling ... all or part of a gaming operation.'" *Id*. (quoting NIGC Bulletin 94-5 at 2). It considered the seven management activities the Bulletin "singles out ... as especially probative of the question whether an agreement is a management contract." *Id.*

The equipment lease contains five of those seven provisions: provisions for maintenance of adequate accounting procedures and preparation of verifiable financial reports on a monthly basis; development and construction costs incurred or financed by a party other than the tribe; term of contract that establishes an ongoing relationship; compensation based on percentage fee (performance); and a provision for assignment or subcontracting of responsibilities. An agreement does not have to include all seven activities to be a management contract. <u>First American</u>. 412 F.3d at 1174. Rather, the "'presence of all or part of these activities in a contract with a tribe strongly suggests that the contract or agreement is a management contract requiring [NIGC] approval.'" *Id.* (quoting Bulletin 94-5 at 2).

The conclusion that the lease and note constitute a management contract is "reinforced by the fact that [they] do[] not much resemble a consulting agreement." *Id*. "A contract that identifies a finite task, specifies a date for its completion, and provides recompense based on an hourly or daily rate or fixed fee 'may very well be determined to be a consulting

agreement' rather than a management contract." *Id.* (quoting Bulletin 94–5 at 3).  The agreement here was essentially open-ended with machine rentals based on a percentage of the income stream from the machines -- the "net win or drop from each and every machine." Admin. R. at 306, ¶ 15.

NGS offers multiple reasons why the note and equipment lease are not a management contract.  Initially it argues that, in her opinion letter, Ms. Coleman significantly relied on the promissory note and that was improper as the note was a separate contract, but not a "collateral agreement."[22]  However, as the lease, by itself, is a management contract, the court does not have to characterize or even consider the impact of the note on the analysis.[23]  It then contends that, as reflected in the recitals in the agreement, the parties did not intend for the lease  to constitute a management agreement.  However, the parties' expressed intent is not controlling when the agreement they executed, due to the rights and obligations it created is a management contract.  An agreement's status as a "management contract," or not, is determined by the substance of the agreement, not the label the parties attach to it.[24]

NGS downplayed the significance of its right to determine, jointly with the Nation,

---

[22]*The Administrative Record does not reflect that either the parties or the NIGC ever considered the note and lease separately, rather than as components of a single agreement.*

[23]*The court does not agree, though, that the note played a significant role in Ms. Coleman's analysis.  The Commission did not rely on it to reach its conclusion.*

[24]*Similarly, the fact that the lease was negotiated with the advice of counsel does not preclude a determination that the agreement is governed by IGRA.*

the exact mix of the machines it will make available. It asserts that the "true management decisions concerning the choice of games are decisions regarding game theme, floor placement, part percentage, game displays and promotions, all of which are retained exclusively to the Enterprise management."   Plaintiff's brief, p. 18.   However, as the Commission  noted in its Final Decision, the "Nation's ability to make decisions regarding theme, placement, displays, and promotions is limited when the Nation cannot freely choose <u>any</u> of the games on its floor."   Admin. Record at 10.[25]

NGS's also argues that the rights to participate in the selection of the accounting firm that will perform the annual "independent certified audit," to control the cash accounting system  and to inspect, have access to books and records and audit are not management functions.   Singly, these provisions might not be enough to render the lease a management agreement.   However, when combined with the other provisions discussed above, they transfer sufficient management responsibility to NGS to"require the Chairman's scrutiny." <u>Wells Fargo Bank</u>, 658 F.3d at 697.

The court agrees with plaintiff that there are distinctions between the equipment lease in this case and other agreements that courts have found to be management contracts.  The Operating Lease reviewed by the Tenth Circuit in <u>First American</u> and the Indenture Agreement analyzed by the Seventh Circuit in <u>Wells Fargo Bank</u> placed significantly more

---

[25]*As the court's discussion is based on its view of the substance of the contractual arrangements, it is unnecessary to address the "Help" email mentioned by plaintiff in its brief. The court also has not discussed other lease provisions that it did not rely upon, but which were cited by Ms. Coleman in her Opinion Letter.  See plaintiff's brief, pp. 21-22.*

management authority in the hands of third parties. However, management contracts are not "only those agreements that strip a tribe of decision-making authority entirely." <u>First American</u>, 412 F.3d at 1175. "[T]he regulations' definition of a management contract as an agreement that provides for the management of 'all or part' of a gaming operation suggests a definition of management that is partial rather than absolute, contingent rather than comprehensive." <i>Id.</i> at 1176. Recognizing that "Congress wrote in broad strokes in crafting this legislation," to "ensure that the tribes retain control of gaming facilities set up under the protection of IGRA and of the revenue from these facilities," <u>Wells Fargo Bank</u>, 658 F.3d at 695, 700, the court concludes that definition is satisfied here.

The NIGC's Final Decision determined both that the equipment lease and promissory note constituted a management contract and that the Commissioner properly disapproved the agreements. However, plaintiff has challenged only the first determination in its appeal and the court has therefore restricted its review to the question of whether the parties' agreement was a management contract under IGRA. Having concluded that it was, it is unnecessary to consider whether the agency should be required to produce documents that might reflect any subjective motivation for its actions.

The Tenth Circuit noted in First American that "[n]on-tribal parties who enter into contracts relating to tribal gaming undertake, in addition to ordinary business risks, certain regulatory risks as well." <u>First American</u>, 412 F.3d at 1178-79. This case no doubt illustrates the accuracy of that observation. To that listing of risks might also be added the uncertainties introduced by tribal politics. Nonetheless, for the reasons indicated, the Final Decision of

the NIGC is **AFFIRMED**.

      **IT IS SO ORDERED**.

      Dated this 13th day of September, 2012.

JOE HEATON
UNITED STATES DISTRICT JUDGE